**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IQS US INC. AND I.Q.S. SHALEV LIMITED, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CALSOFT LABS INCORPORATED AND ) <br> PROMETRIC INC., ) <br> ) <br> Defendants. ) | Case No. 16 CV 7774 <br><br> Judge Joan H. Lefkow |

## OPINION AND ORDER

IQS US Inc. and I.Q.S. Shalev Limited filed suit against Calsoft Labs Incorporated and Prometric Inc., alleging infringement of U.S. Patent No. 7,773,779 (the '779 patent) against each defendant (counts I and II). Calsoft and Prometric have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 28.) For the reasons stated below, the motion is granted.[1]

## BACKGROUND[2]

IQS US Inc. and I.Q.S. Shalev Limited are corporations that deal in biometric identification and verification systems. (Dkt. 1 ¶ 3.) I.Q.S. Shalev owns the '779 patent and licenses it exclusively to IQS US. (*Id.* ¶¶ 13–14.) The '779 patent relates to "[a] system for providing global biometric identification services to a plurality of remote parties . . . ." (Dkt. 1-1 Col. 1:7–8.) It issued in August 2010. (Dkt. 1 ¶ 12.)

---

[1] The court has jurisdiction under 28 U.S.C. § 1338(a). Venue is proper under 28 U.S.C. § 1391(b).

[2] Unless otherwise noted, the following facts are taken from plaintiff's complaint and are presumed true for the purpose of resolving the pending motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011) (citation omitted).

Calsoft deals in "enterprise information technology and product engineering services." (Dkt. 1 ¶ 4.) At some point, Calsoft built a cloud-based biometric fingerprint authentication system (the BAS). (*Id.* ¶¶ 4, 17.) Prometric runs testing centers where it administers a variety of tests. (*Id.* ¶ 19.) Calsoft has provided Prometric with the BAS, thereby allowing Prometric to confirm a test-taker's identity. (*Id.* ¶¶ 8, 18.) As used by Prometric, the BAS first scans a test-taker's fingerprint to create an enrolled template. (*Id.* ¶ 18.) The template is then transferred to and stored by a third-party vendor. (*Id.* ¶ 19.) As the test-taker moves throughout the testing center, she (presumably) has her fingerprint scanned again to create a verification template. The verification template is compared to the enrolled template to confirm the test-taker's identity. (*Id.* ¶ 20.)

Plaintiffs allege that the BAS infringes claims 1, 2–6, 10, 11, and 14–18 of the '779 patent. Calsoft and Prometric move to dismiss the complaint, arguing that the asserted claims of the '779 patent are invalid and unenforceable because they are directed to an abstract idea that is not eligible for patent protection under 35 U.S.C. § 101.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim on which relief may be granted. In ruling on such a motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011) (citation omitted). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, 574 U.S. ----, 135 S. Ct. 346, 346, 190 L. Ed. 2d 309 (2014) (per curiam) ("Federal pleading rules call for 'a short and plain statement of the claim showing the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." (citations omitted)). Because subject matter eligibility is a question of law, *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), the issue may be decided on a motion to dismiss. *See, e.g.*, *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

**ANALYSIS**

Defendants argue that the '779 patent is directed to a patent-ineligible abstract idea: comparing one thing to another. Section 101 of the Patent Act defines the subject matter eligible for patent protection. This section provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has long held that there are implicit exceptions to this provision: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty.* v. *CLS Bank Int'l*, --- U.S. ---, 134 S. Ct. 2347, 2354, 189 L. Ed. 2d 296 (2014) (quoting *Ass'n for Molecular Pathology* v. *Myriad Genetics, Inc.*, 569 U.S.---, 133 S. Ct. 2107, 2116, 186 L. Ed. 2d 124 (2013)).

*Alice* applied the framework set forth in *Mayo Collaborative Servs.* v. *Prometheus Laboratories, Inc.*, 566 U.S. 66, 132 S. Ct. 1289, 182 L. Ed. 2d 321 (2012), "for distinguishing

3

patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts," 134 S. Ct. at 2355, to the question of patentability of a computer system and program code configured to carry out a method for intermediated settlement of financial transactions. As described in *Alice*, a court "must first determine whether the claims at issue are directed to a patent-ineligible concept." *Id.* If the patent is directed at a law of nature, natural phenomena, or abstract idea, the court must next consider whether the claims contain an "inventive concept" that "transform[s] the nature of the claim" into patent-eligible subject matter. *Id.* at 2357.

### A. Whether the Claims of the '779 Patent Are Directed to an Abstract Idea

"The abstract ideas category embodies the longstanding rule that an idea of itself is not patentable." *Alice*, 134 S. Ct. at 2355 (citations and brackets omitted). "[W]ell-understood, routine, conventional activit[ies]" applying a law of nature are not patentable. *Mayo*, 132 S. Ct. at 1298. Further, "tying an abstract idea to a general purpose computer or to the Internet, without more, is generally insufficient to make an abstract idea patentable." *In re TLI Commc'ns LLC Patent Litig.*, 87 F. Supp. 3d 773, 784 (E.D. Va. 2015) (citing *Ultramercial, Inc.* v. *Hulu, LLC*, 772 F.3d 709, 715–17 (Fed. Cir. 2014)).

Calsoft argues that the '779 patent is directed toward the abstract idea of comparing one thing to another. Claim 1 of the '779 patent (which is representative[3]) recites

> 1. System for providing global biometric identification services to a plurality of remote parties, the system comprising:
> a template receiver, comprising
> a) a registration input configured to receive from at least one remote party communicating with said template receiver, at least one registration template complete as originally extracted from a respective biometric sample of an end

---

[3] After examining the claims at issue, the court determines that all asserted claims are substantially similar and linked to the same idea and declines to discuss each individually. *See Content Extraction*, 776 F.3d at 1348.

> user of said remote registering party, associated with a tag relating said registration template to said end user; and
> b) an enquiry input, configured to receive from a remote inquiring party communicating with said template receiver, at least one test template complete as originally extracted from a respective biometric sample of a person; and
> a verifier, associated with said template receiver, configured to determine a degree of match between said registration template and said test template, by directly comparing the registration template complete as originally extracted with the test template complete as originally extracted, thereby to verify said person as an end user, using said determined degree of match.

(Dkt. 1-1 Col. 19:12–34.)

At base, claim 1 recites a system with two components: a template receiver and a verifier, both of which are configured to receive templates. The templates at issue are "binary record[s] created from distinctive information from a biometric sample such as a fingerprint image, a face image, an iris image, etc." (Dkt. 1-1 Col. 7:16–18.) A registration template, which is linked to a specific person, is compared to a test template for the purposes of determining or confirming an individual's identity. This is not a new process. For instance, humans have long compared images of faces they have seen previously (an old-fashioned registration template) to faces they encounter in the world to determine or confirm an individual's identity. Plaintiffs argue that the patent is not directed to an abstract idea in part because a condensed-form template, whose smaller size is easier to transmit, "may be generated using an algorithm, which analyzes locations of minutia [sic] contained in fingerprints or a mathematical summary of the patterns of an iris image . . . ." (Dkt. 1-1 Col. 7:22–25.) But this does not change the court's perspective, as the Federal Circuit continues to treat "analyzing information . . . by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Synopsys, Inc.* v. *Mentor Graphics Corp.*, 839 F.3d 1138, 1146–47 (Fed. Cir. 2016) (citation omitted).

Calsoft and Prometric also cite several decisions where a court has found similar concepts to be abstract ideas. For example, in *Content Extraction and Transmission LLC* v. *Wells*

*Fargo Bank, National Association*, the Federal Circuit found that claims drawn to the abstract idea of "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" are not patent-eligible under § 101. 776 F.3d 1343, 1347 (Fed. Cir. 2014). Additionally, a district court in the Northern District of California recently found that claims "generally directed to the abstract concept of comparing one thing to another" are similarly patent-ineligible. *Blue Spike, LLC* v. *Google Inc.*, No. 14-CV-01650-YGR, 2015 WL 5260506, at *5 (N.D. Cal. Sept. 8, 2015), *aff'd*, 669 F. App'x 575 (Fed. Cir. 2016), *cert. denied*, No. 16-1223, 2017 WL 1365602 (U.S. June 12, 2017). Plaintiffs do not address either case in their response.

Instead, they cite to *Amdocs (Israel) Ltd.* v. *Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016), where the Federal Circuit found a claim was not directed at an abstract idea because it "entail[ed] an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)." *Id.* at 1300. That is not the situation here. Plaintiffs argue that the '779 patent "focus[es] on a specific means or method that improves the relevant technology of a global biometric authentication system." (Dkt. 36 at 2). But neither the template receiver nor the verifier has any relation to the *creation* of a template; the plain language of claim 1 states that the system components only *receive* and *compare* the templates. Indeed, the '779 patent makes clear that the templates are created outside of the claimed system, submitted by a registration party and an inquiring party. (*See* dkt. 1-1 Col. 7:36–8:6.) Nor does the patent discuss *how* the templates are compared. And even though part of the system operates remotely, that does not evidence a non-abstract concept. *See, e.g.*, *Joao Control & Monitoring Sys., LLC* v. *Telular Corp.*, 173 F. Supp. 3d 717, 727 (N.D. Ill. 2016), *on reconsideration in part*, No. 14-C-9852, 2017 WL 1151052

(N.D. Ill. Mar. 28, 2017) ("[A] claimed invention's ability to operate remotely has played little to no role in other courts' § 101 analyses.") (collecting cases). Instead, the '779 patent is directed to a "well-known" concept that "humans have always performed." *Content Extraction,* 776 F.3d at 1347.

> **B.** **Whether the Claims of the '779 Patent Contain an Inventive Concept**

Section 101 analysis next requires the court to determine whether a claim directed at an abstract idea contains an "inventive concept." *See Alice,* 134 S. Ct. at 2355. In this step, the court looks for "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* (citations and brackets omitted). "A claim that recites an abstract idea must include additional features to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* (citations omitted) (quoting *Mayo*, 132 S. Ct. at 1297) (alterations in *Alice* not *Mayo*). Those additional features must be more than "well-understood, routine, conventional activity." *Mayo*, 132 S. Ct. at 1298. Claims must do more than simply instruct the practitioner to implement the abstract idea on a generic computer. *Alice*, 134 S. Ct. at 2359–60.

*Alice* provides no bright line for patentability under § 101, and lower courts have endeavored to draw one in cases presenting *Alice*-based challenges to patentability. One well-considered decision is *Market Track, LLC* v. *Efficient Collaborative Retail Marketing, LLC*, No. 14-C-4957, 2015 WL 3637740 (N.D. Ill. June 12, 2015), in which the court examined post-*Alice* opinions from the Federal Circuit. The court inferred from the decisions that it is important to consider (1) whether the claims attempt "to transform an abstract idea to patentable subject matter simply by limiting the method to a particular industry or to a particular technological context;" (2) "the nature of the problem to be solved; problems that arise uniquely in computing

or in an internet context weigh in favor of finding an 'inventive concept;'" and (3) "whether claim elements using procedures that pre-date the filing of the patent provide the 'inventive concept.'"[4] *Id.* at *5. Since *Market Track*, the Federal Circuit has also instructed courts to examine whether a claim would monopolize or preempt implementation of an abstract idea. *See, e.g.*, *Amdocs*, 841 F.3d at 1299 (citing *Bascom Glob. Internet Servs., Inc.* v. *AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016)) (finding an inventive concept in part because "the claims did not preempt all ways" of implementing an abstract idea); *compare with Ariosa Diagnostics, Inc.* v. *Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 2511, 195 L. Ed. 2d 841 (2016) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility.")

Applying these criteria here points toward unpatentability. First, the claims are limited to a particular industry: "biometric identification services." (Dkt. 1-1 Abstract). Second, the '779 patent is not directed at a problem unique to computing or related to the internet.[5] The specification explains that "[a] complete biometric system may be too expensive to buy and maintain, specifically for a relatively small business, which may not have experienced IT workers, and cannot finance the development of a complete biometric system which suits the needs of the business." (Dkt. 1-1 Col. 3:7–11.) According to plaintiffs, the '779 patent "overcomes the challenges associated with those limitations by 'allowing small businesses, organizations, etc[.], which lack a full end-to-end biometric system of their own' to employ

---

[4] "Although patentable subject matter under § 101 follows a separate test from novelty or obviousness, under § 102(a) and § 103, respectively, certain facts that are relevant to novelty or obviousness are also relevant to *Mayo* step two." *Mkt. Track*, 2015 WL 3637740, at *5.

[5] In an attempt to show a technical improvement over the prior art, plaintiffs highlight a preferred embodiment of the '779 patent that states "there is carried out a multi-step interaction with an inquiring party, for providing a more accurate and reliable biometric identification." (Dkt. 36 at 7.) As defendants point out, this embodiment is not found in the asserted claims. It therefore has no bearing on the motion.

8

high-security biometric identification technology." (Dkt. 36 at 2 (alteration in original) (quoting dkt. 1-1 Col. 6:64–66).) But the '779 patent does not describe a technological improvement of any kind. Rather, it focuses on making a biometric identification system more affordable by making part of the system remote and allowing users to access it through a subscription service. (*See* dkt. 1-1 Col. 5:64–68.)

Third, the '779 patent's use of existing technology provides no inventive concept. For example, "[i]mplementation of the method and system . . . involves performing or completing certain selected tasks or steps manually, automatically, or a combination thereof." (Dkt 1-1 Col. 4:51–54.) Implementation by hardware could take the form of a chip or circuit; implementation by software could be a plurality of software instructions "executed by a computer using any suitable operating system." *Id.* Col. 4:55–67. These are nothing more than invocations of generic descriptions of computer components that do not rise to the level of inventive concept. *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2357) ("For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"). Although plaintiffs assert that "distributed, Internet-based, remote authentication architecture" makes security breaches and "hacks" more difficult, there is nothing in the '779 patent that references increased security. Regardless, even accepting plaintiffs' assertion, storing data on the cloud as opposed to locally is not an inventive concept. Similarly, plaintiffs' references to claims 18 and 19's "allowing remote parties to identify and remove duplicate templates from the system's database" likewise fail to demonstrate an inventive concept.

Finally, the '779 patent threatens broad preemption. There is nothing unique about the

9

arrangement of the receiver and verifier; any system providing global biometric identification services to remote parties would have to receive and compare templates from those remote parties.[6] The claimed system is readily comparable to the system found unpatentable in *Blue Spike*. The court there explained that the patent merely described the use of routine computer components and methods, including general-purpose computers and databases, to implement the conventional activity of comparing one thing to another. 2015 WL 5260506, at *6. Similarly, the '779 patent describes the use of widely-used and well-known tools (basic chips, circuitry, computers, and databases) to implement the same conventional activity.

## ORDER

Accordingly, defendants' motion to dismiss (dkt. 27) is granted. Counts I and II are dismissed with prejudice. This case is terminated.

Date: August 18, 2017

_____
U.S. District Judge Joan H. Lefkow

---

[6] The section of IQS's brief discussing this issue is heavy on citations but light on application of those cases to the claims at issue. (Dkt. 36 at 8–9.)